UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ALEX CRUZ and MASON MAHER III,

Plaintiffs,

v.

THE CITY OF PATERSON et al.,

Defendants.

No. 2:20-cv-15802
(MEF)(CF)

OPINION and ORDER

## Table of Contents

I.   Background
     A.   The Allegations
     B.   Procedural History
II.  The Free Speech Claim
     A.   Protected Speech
          1.  Citizen Speech
               a)  The Courts of Appeals
               b)  Janus
               c)  Third Circuit Cases
               d)  Conclusion
          2.  Public Concern
               a)  Benefits
               b)  Transfers
               c)  Personnel Records
          3.  Balancing
     B.   Motivating Factor
          1.  Causation
          2.  Retaliation

C.    Conclusion

III. Other Claims

IV.  Qualified Immunity

V.   Conclusion

\*    \*    \*

Two officials of public-employee unions came to believe they were being retaliated against by municipal leaders for filing labor grievances.

So the union officials sued, claiming, among other things, that their federal free speech rights had been violated.

The municipal leaders have moved to dismiss.

Their motion is denied.

\*    \*    \*

## I.    Background

### A.    The Allegations

Because this is a motion to dismiss, the Court must take the Plaintiffs' allegations as true.  See McTernan v. City of York, 577 F.3d 521, 526 (3d Cir. 2009).  Whether they are in fact true is a question for later in the case.

The allegations for now are as follows.[1]

\*    \*    \*

Two members of a municipal police force[2] served as the presidents of their local unions.  See Second Amended Complaint and Jury Demand ("Complaint") (ECF 54) ¶¶ 3-4.

---

[1]  Added allegations are discussed below as they become relevant.

[2]  The municipality is the City of Paterson.  The members of the force are Alex Cruz and Mason Maher III.  See Second Amended Complaint and Jury Demand ("Complaint") (ECF 54) ¶¶ 3-4.  Mr. Cruz is a "rank and file police officer" and the President of the Paterson Police PBA Local 1.  See id. ¶¶ 3, 8.  Mr. Maher is a lieutenant and President of the Paterson Police PBA Local 1 Superior Officers Association.  See id. ¶¶ 4, 9.

2

Over the course of several years, they filed various grievances and unfair practice charges on behalf of those unions.[3]  See, e.g., id. ¶¶ 17, 24-25, 33, 40.

The union leaders came to believe that the municipality's Mayor[4] and Police Chief[5] retaliated against them for making these filings.[6]

### B.  Procedural History

In light of the above, the union officials (from here, "the Plaintiffs") sued the Mayor and the Police Chief (together, "the Defendants").  The Plaintiffs claim, among other things, that the Defendants retaliated against them in violation of their First Amendment free-speech rights.[7]  See id. ¶¶ 108-25.

The Defendants have moved to dismiss the claims.  See Defendants' Brief in Support of Motion to Dismiss the Second Amended Complaint Pursuant to F.R.C.P. 12(b)(6) ("Defendants' Brief") (ECF 56-2) at 1.

The motion is now before the Court.[8]

---

[3]  The unfair practice charges were filed with the New Jersey Public Employment Relations Commission.  See Complaint ¶¶ 24, 40; see also id. ¶¶ 63, 69, 91.  More below on the substance of the grievances and unfair practice charges.

[4]  Andre Sayegh.

[5]  Ibrahim Michael Baycora.

[6]  The retaliatory actions included (i) initiating internal affairs investigations against the union officials, see Complaint ¶¶ 55-57, and (ii) altering some nuts-and-bolts aspects of the union officials' employment.  See id. ¶¶ 45-49, 58-59, 61-65, 79-81, 86-87.  More below on (ii).

[7]  There are other claims, too.  Federal claims for violating the right-to-petition and free-association guarantees of the First Amendment.  See Complaint ¶¶ 112-19.  And claims under New Jersey's First Amendment-equivalent, which is at Article I of the New Jersey Constitution.  See id. ¶¶ 120-25.  The cause of action for the federal claims comes from 42 U.S.C. § 1983.  See id. ¶¶ 1, 108-19.  For the state claim, the cause of action comes from N.J.S.A. § 10:6-2.  See id. ¶¶ 2, 120-25.  More on all of these claims in Part III.

[8]  Another defendant, the City of Paterson, has also moved to dismiss the claims against it.  See Defendants' Brief at 1.  The

## II.  The Free Speech Claim

Have the Plaintiffs adequately alleged that the Defendants violated their First Amendment free-speech rights?

Recall that, as members of a municipal police force, the Plaintiff-union officials are public employees.  See Complaint ¶¶ 3-4.

"To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action."  Munroe v. Cent. Bucks Sch. Dist., 805 F.3d 454, 466 (3d Cir. 2015) (cleaned up); Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 987 (3d Cir. 2014); Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009).[9]

Work through these two requirements now.

### A.    Protected Speech

The first question: was the union officials' speech "protected by the First Amendment"?  Munroe, 805 F.3d at 466.  (The "speech" here is the alleged filing of union grievances and unfair practice charges.[10])

A public employee's speech gets First Amendment protection only if three bars are cleared.  See Dougherty, 772 F.3d at 987.

"[F]irst, the employee must [have been] speak[ing] as a citizen, not as an employee."  Id.

"[S]econd, the [employee's] speech must [have] involve[d] a matter of public concern."  Id.

---

Court takes on that motion in a separate Opinion and Order, to be filed later today.

[9]  Some Third Circuit cases might be taken to suggest that a third box must also be checked.  That possibility is discussed below.  See footnote 30.

[10]  For simplicity, from here these are called, collectively, "grievances."  Note also that the Defendants have not meaningfully argued that filing grievances does not count as "speech" --- only that it is not speech that is protected under the First Amendment.

4

And "third, the government must [have] lack[ed] an adequate justification for treating the employee differently than the general public based on its needs as an employer." Id. (cleaned up).

Take these up below, each in turn.

### 1. Citizen Speech

When they filed the relevant grievances, were the Plaintiff-union officials speaking as (i) "employee[s]" or (ii) "citizen[s]"? Id.

For public employees, the border between (i) "employee speech" and (ii) "citizen speech" is marked out by the "official duties" test. Lane v. Franks, 573 U.S. 228, 237 (2014) (cleaned up); see id. at 240 ("The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties.").

Under the "official duties" test, the core question is whether the relevant "utterances were among the things that the employee was employed" or "paid" to do. Flora v. County of Luzerne, 776 F.3d 169, 177-78 (3d Cir. 2015).

Why does this matter?

Because when public employees speak "pursuant to their official duties," they "are not speaking as citizens for First Amendment purposes," and so their speech is not constitutionally protected "from employer discipline." Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).

But when a public employee speaks outside of her official duties, she is speaking as anyone else might --- as a citizen. And so despite her government employment, her speech may be protected. See id. at 421-22.[11]

_____

[11] Two points here. First, a person can generally come to file a grievance on behalf of a public-employee union only because she is a public employee in the first place. So there will typically be a causal link between (i) the fact of being a public employee, and (ii) the filing of a union grievance. But that does not automatically convert a grievance into employee speech. The test for whether something said by a public employee counts as employee speech is not whether there is a causal connection between the speech in question and the

       \*  \*  \*

Here, there is no suggestion in the complaint that the union officials were "paid" or "employed" by the municipality to file grievances against the police department.  Flora, 776 F.3d at 177-78.

And as the Third Circuit has observed,[12] "it is hard to imagine a situation where a public employee's membership in a union would be one of his 'official duties.'"  Palardy v. Township of Millburn, 906 F.3d 76, 83 (3d Cir. 2018) (quoting Garcetti, 547 U.S. at 421).[13]

Accordingly, the Court holds that official duties test is not passed.  The Plaintiff-union officials' filing of the grievances counts as (possibly protected) citizen speech.  Not as (unprotected) employee speech.

       \*  \*  \*

_____

speaker's status as a public employee.  It is the official duties test.  See Garcetti, 547 U.S. at 421.  Second, a union grievance will often be closely related to nuts-and-bolts workplace issues.  So in many circumstances, in filing a grievance a union official will be speaking about the workplace.  But similar point.  The test zeroes in on official duties.  Not on whether the subject matter of the speech in question is tied to work.  See Lane, 573 U.S. at 240; see also Flora, 776 F.3d at 177-79 (rejecting a test that would have inquired into whether the speech was "related to" job duties) (cleaned up).

[12]  Though in dicta, and in a case about free association, not free speech.  See Palardy v. Township of Millburn, 906 F.3d 76, 81-84 (3d Cir. 2018).

[13]  What matters are not the "duties" a public employee may owe to the union he helps lead.  Those duties may include filing grievances.  Rather, what counts are the duties the public employee owes to his employer.  See Palardy, 906 F.3d at 84 (noting that an employee's official "job duties derive from the needs of the employer") (emphasis added).  And the duties an employee owes to his employer do not generally include pressing grievances against that same employer.  (In a "company union" setting, duties to an employer and the union might blur.  But while they are prevalent in some countries, company unions have long been curbed in the United States, principally by Section 8(a)(2) of the National Labor Relations Act of 1935.)

This holding is backed up by the caselaw.

By the rulings of various courts of appeals.  <u>See</u> Part II.A.1.a. A relatively recent Supreme Court opinion.  <u>See</u> Part II.A.1.b. And a look to the Third Circuit's general retaliatory-speech jurisprudence.  <u>See</u> Part II.A.1.c.

Take up each of these now.

### a)    <u>The Courts of Appeals</u>

The Third Circuit has not yet ruled upon the precise question on the table, of whether a public employee speaks as a citizen or as an employee when he files a grievance on behalf of the union he helps to lead.

But other courts of appeals have weighed in.

*    *    *

Start with the Sixth Circuit's decision in <u>Boulton</u> v. <u>Swanson</u>, 795 F.3d 526 (6th Cir. 2015).

There, a union kicked off "mandatory contract arbitration" with a local sheriff's office.  <u>Id</u>. at 529.  At the arbitration, the union leader gave testimony that was critical of certain government officials.  <u>See id</u>.  And after that, he alleged that he faced retaliation --- and that this violated his free speech rights.  <u>See id</u>. at 529-30.

Per the Sixth Circuit, whether the union leader was speaking as a "citizen" at the arbitration was a "threshold inquiry."  <u>Id</u>. at 531 (cleaned up).  And that boiled down to whether his statements were made "pursuant to [his] official duties."  <u>Id</u>. at 532 (cleaned up).

The Sixth Circuit reasoned that it is "axiomatic that an employee's job responsibilities do not include acting in the capacity of a union member, leader, or official."  <u>Id</u>. at 534. Accordingly, it held that "speech in connection with union activities is speech 'as a citizen' for the purposes of the First Amendment."  <u>Id</u>.

This holding implies that when union officials file grievances, they will generally be speaking as citizens rather than as employees.  Filing a union grievance is, after all, speech "connect[ed] with union activities."  <u>Id</u>.

*    *    *

7

A Ninth Circuit decision points the same way.

In Ellins v. City of Sierra Madre, 710 F.3d 1049 (9th Cir. 2013), a police officer serving as the president of his union "led a no-confidence vote of the . . . union against the Chief of Police." Id. 1053-54. After that, the union official alleged that he faced retaliation. See id. at 1053.

Per the Ninth Circuit, the union official's "daily professional duties as a police officer did not include acting as a union representative or serving as the President of the [local union]." Id. at 1059.

And "[g]iven the inherent institutional conflict of interest between an employer and its employees' union, . . . a police officer does not act in furtherance of his public duties when speaking as a representative of the police union." Id. at 1060.

For that reason, the court of appeals held that "a reasonable jury could find that [the plaintiff's] speech, made as a representative and president of the police union, was made in his capacity as a private citizen." Id.

\*    \*    \*

Look now to two Seventh Circuit cases.

In Nagle v. Village of Calumet Park, 554 F.3d 1106 (7th Cir. 2009), a public-employee union official made certain statements at a meeting with management --- and then was allegedly retaliated against. Id. at 1122-23. Per the court, the union official's speech counted as citizen speech, not employee speech, because he "was speaking in his capacity as a union representative" at the meeting. Id. at 1223.

And in Fuerst v. Clarke, 454 F.3d 770 (7th Cir. 2006), a deputy sheriff, who also served as union president, was passed over for a promotion after publicly criticizing a proposal from a county official. Id. at 771-72. The Seventh Circuit held that this was citizen speech, "[b]ecause [the public] comments that precipitated the adverse action taken against him were made in his capacity as a union representative, rather than in the course of his employment as a deputy sheriff." Id. at 774.

\*    \*    \*

Bottom line: the Sixth, Ninth, and Seventh Circuits have held that when a public-employee union leader speaks in his capacity

as a union official, his speech is citizen speech, not employee speech.[14]

This supports the conclusion that the Plaintiff-union officials in this case were engaged in citizen speech.

Their speech was filing grievances.  And when a union official files a grievance on behalf of his union, he is plainly acting in his "capacity" as a union official.

*    *    *

Before moving on, note that there is some daylight in the law here.

Against the Sixth, Ninth, and Seventh Circuits, some other federal appellate courts have held that whether someone is acting in their "capacity" as a union official is not the only thing to consider.

These other courts have declined to "decide categorically, as [the above] circuits have, that when a person speaks in his or her capacity as a union member, he or she speaks as a private citizen."  Montero v. City of Yonkers, 890 F.3d 386, 398 (2d Cir. 2018); see Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 136 (1st Cir. 2022) (similar); see also Hubbard v. Clayton Cnty. Sch. Dist., 756 F.3d 1264, 1267-68 (11th Cir. 2014).

These circuits' non-categorial approach rests on the idea that a more searching analysis is needed --- a close-in look at both the speech that the union official offered up in his union capacity, and the context in which it was made.

But in this case, even if the Court were to take a non-categorical approach --- that would not change the picture.  The

---

[14]  District judges within the Third Circuit have generally landed on this same conclusion.  See, e.g., Corcoran v. Cauwels, 2019 WL 3774591, at *6-7 (D.N.J. Aug. 9, 2019); Lahovski v. Rush Township, 441 F. Supp. 3d 43, 58 (M.D. Pa. 2020); see also Foster v. Township of Pennsauken, 2018 WL 3742621, at *2, *15 (D.N.J. Aug. 7, 2018); Myers v. City of Wilkes-Barre, 448 F. Supp. 3d 400, 411-14 (M.D. Pa. 2020).  But not across the board. See, e.g., Sosinavage v. Thomson, 2022 WL 16695110, at *5 (D.N.J. Nov. 2, 2022); Beresford v. Wall Twp. Bd. of Educ., 2010 WL 445684, at *6 (D.N.J. Feb. 3, 2010).

Plaintiffs' speech would still be citizen speech, not employee speech.

To see why, consider, using an example, a main reason why some courts have opted to go the non-categorical route in the first place.

For the example, think of a nurse who works for a town's public hospital.  Say that she speaks on TV about the need to put hands on state funding to keep the hospital up and running --- because, she says, "if people cannot quickly get to a nearby ER, lives will be lost."

Imagine further that the nurse is a union leader.  That the union she runs wants the hospital kept open.  And that she has gone on TV for the purpose of speaking for the union --- she is addressing the public in that "capacity."

What if the nurse does not clearly identify herself as a union leader?  In that circumstance, things may get confusing.  How might a viewer understand things?  Is the nurse speaking for herself?  Is she speaking for the town, about _its_ sense of what will happen if the state does not step up with funding and the hospital is shuttered?  Or is the nurse speaking for her union?

The nurse _was_ speaking for her union.  That was, in the example, her purpose for going on TV.

But does it only matter whether something is _said_ in a union capacity?[15]  Or does it also matter whether it is _understood_ by others as having been said in a union capacity?[16]

The categorial approach to the speech of public employees seems to leave room only for consideration of the first question.[17]

---

[15]  In which case, the nurse's speech was potentially protected, and the town might not be allowed to discipline her for leaving the possible impression with TV watchers that she was speaking for the town.

[16]  In which case, the nurse's speech was perhaps not protected, and the town might be allowed to discipline her for allowing the possible impression that the town (through the nurse) was saying that the state was putting lives at risk.

[17]  Because if the speech in question was made in a union capacity, that is the end of the analysis.  See _Boulton_, 795

And part of the reason for taking the non-categorical approach is to leave some space for working through both of the questions --- as to how something is said, and as to how it is understood. See, e.g., Hubbard, 756 F.3d at 1265, 1267-68 (holding that press statements by a union official were not "employee" speech in part because the speech was "clearly separate" from the plaintiff's workplace "duties," and the speech "was not an official communication of the school district," making it "clear that [the union official] was speaking in his capacity as president of [the union]" and that his "speech could not reasonably be attributed to the [s]chool [d]istrict"); see also, e.g., Bruce, 34 F.4th at 131-34, 136-37 (holding that press statements by a union official "to a television network about proposed budget cuts" were not employee speech in part because it was "evident that" he "was speaking in his capacity 'as a citizen' during the interview," in part because the TV station "identified [the official] to its viewers as . . . 'President of the Union'").

But nothing turns on any of this here.

Filing a formal labor grievance is basic, bread-and-butter union activity, and obviously so.  A union leader who files a grievance for a union is doing so as a union leader --- and there is no missing that.

This means that there is no real danger of a misunderstanding, or of someone looking in from the outside and thinking that when the union filed a grievance against the employer it was somehow acting on behalf of the employer.

*    *    *

Bottom line: the filing of a formal grievance by a union official on behalf of his union counts as "citizen" speech, not "employee" speech.

This is true under the categorical approach --- because a union grievance is filed by a union official in his "capacity" as a union leader.

And this is also true under the non-categorical approach --- because filing a union grievance is plainly union activity.  So there can be no meaningful chance of a misread, no real

---

F.3d at 534; Ellins, 710 F.3d at 1060; Fuerst, 454 F.3d at 774; Nagle, 554 F.3d at 1123.

possibility of anyone (wrongly) thinking that filing a grievance <u>against</u> an employer is somehow part of an employee's duties <u>to</u> his employer.

### b)    <u>Janus</u>

The Plaintiff-union officials' filing of grievances here counts as potentially protected citizen speech, not unprotected employee speech.

That conclusion is backed up by the various court of appeals decisions to have addressed the question --- both those that take the categorical approach, and those that go the non-categorical route.  <u>See</u> Part II.A.1.a.

And it is also supported by the Supreme Court's decision in <u>Janus</u> v. <u>American Federation of State, County, and Municipal Employees</u>, 585 U.S. 878 (2018).

In <u>Janus</u>, the respondents argued that "union speech in . . . grievance proceedings should be treated like" employee speech --- that is, like "speech 'pursuant to [an employee's] official duties.'"  <u>Id</u>. at 909 (quoting <u>Garcetti</u>, 547 U.S. at 421) (alteration in original).

But the Supreme Court rejected this argument:

> When an employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer.  The employee is effectively the employer's spokesperson.  But when a union . . . represents employees in disciplinary proceedings, the union speaks for the <u>employees</u>, not the employer.  Otherwise, the employer would be . . . disputing its own actions.  That is not what anybody understands to be happening.
>
> What is more, if the union's speech is really the employer's speech, then the employer could dictate what the union says.  Unions, we trust, would be appalled by such a suggestion.  For these reasons, <u>Garcetti</u>[18] is totally inapposite here.

---

[18]  Which held that a public employee's speech was not protected under the First Amendment because it was "employee" speech.  <u>See</u> <u>Garcetti</u>, 547 U.S. at 426.

*Id.* at 910 (footnote added).

Per *Janus*, then, when union officials kick off "grievance proceedings," *id.* at 909, they "speak[] for the employees, not the employer." *Id.* at 910 (emphasis omitted). Why? Because putting forward a grievance is not "part of the employee's job duties." *Id.* So when he files a union grievance, "the employee's words are [not] really the words of the employer." *Id.*

And because he is not purporting to speak *for* his employer, his speech is eligible for protection *from* his employer. His speech is not unprotected "employee" speech --- the speech of an agent that can be controlled on a relatively freer basis by the principal. It is, rather, his own speech. And it may therefore count as protected as "citizen" speech. See *id.*[19]

### c)    Third Circuit Cases

As seen above, (i) courts of appeals cases that specifically zero in on labor-union speech, see Part II.A.1.a, and (ii) the Supreme Court's *Janus* opinion, see Part II.A.1.b --- these firm up this Court's holding that the Plaintiff-union officials' filing of grievances in this case counts as citizen speech, not employee speech.

What about Third Circuit cases?

---

[19] *Janus*, to be sure, is not directly on point. It was a First Amendment compelled-speech case, not a First Amendment retaliation case. See *Janus*, 585 U.S. at 889. But the above-quoted parts of the opinion are drawn from a sustained and systematic discussion of First Amendment retaliation. And, in any event, statements from the Supreme Court, made in any context, serve as strong guidance for lower courts. See *Schwab v. Crosby*, 451 F.3d 1308, 1325-26 (11th Cir. 2006); see also, e.g., *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 281-82 (4th Cir. 2019); *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064-65 (8th Cir. 2017); *Newdow v. Peterson*, 753 F.3d 105, 108 n.3 (2d Cir. 2014); *A.C.L.U. of Ky. v. McCreary County*, 607 F.3d 439, 447 (6th Cir. 2010); *Oyebanji v. Gonzales*, 418 F.3d 260, 264-65 (3d Cir. 2005); *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996); *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991).

As noted, no precedential Third Circuit opinion specifically addresses the way in which First Amendment retaliation law applies in the union grievance context.

But the Court's holding here is consistent with the key points of the Third Circuit's First Amendment retaliation jurisprudence.

\*   \*   \*

Take Flora v. County of Luzerne, 776 F.3d 169 (3d Cir. 2015) as the stepping-off point.

In Flora, a senior public defender filed a class action lawsuit to challenge alleged underfunding of his office, and claimed that he was fired for doing so. See id. at 171-73. Per the Third Circuit, whether the plaintiff was "speaking as a citizen" or as "an employee of the Public Defender's Office" when he brought the lawsuit, id. at 175 --- that depended on "whether the filing of [the class action was] within [the plaintiff's] ordinary job duties as the Chief Public Defender." Id. at 179.

The court of appeals held that it was not. See id. at 179.

Per the Third Circuit, the plaintiff was "responsible for his office's representation of its clients" and "learned about . . . the funding crisis . . . in the course of his job duties." Id. at 180. But pressing a lawsuit challenging funding levels "was not part of his ordinary responsibilities" because "it was not part of the work he was paid to perform on an ordinary basis." Id.

That seems to cinch things here.

The Plaintiffs in this case are simultaneously police officials and union officials. But there is no suggestion that the work they were "paid to perform on an ordinary basis" by their employer included filing grievances against the police department. Pressing grievances may have been part of their everyday duties as union officials. But not their everyday duties as police officers. And that is what counts.[20]

\*   \*   \*

---

[20]  See footnote 13.

<u>Javitz</u> v. <u>County of Luzerne</u>, 940 F.3d 858 (3d Cir. 2019), runs the same way.

There, a county human resources director alleged that she was retaliated against for filing complaints to her supervisor and the district attorney, suggesting that she had been improperly audio-recorded at work. See <u>id</u>. at 861-62.

Per the court of appeals, these complaints fell "outside the scope of her primary job duties" as an HR professional, and therefore they were to be chalked up as potentially protected "citizen speech." <u>Id</u>. at 865.

True, the plaintiff was no ordinary "citizen." <u>Id</u>. As the county HR director, she had special "access" not available to others as a result of her senior position. <u>Id</u>. But this "access," the court held, was "secondary to [the] citizen speech inquiry," which puts the "focus on" the plaintiff's "primary job duties." <u>Id</u>.

That is, it did not matter that, by virtue of her work, the HR director could pick up the phone and call the DA in a way that others realistically could not.

> [U]nless the mode and manner of [her] speech was part of the work she was paid to perform on an ordinary basis, the fact that she could easily contact the District Attorney by virtue of her employment does not support a finding that [she] spoke as an employee and not a citizen.

<u>Id</u>. at 866 (cleaned up).

Local union leaders (like the Plaintiffs here) will almost always have special "access," <u>id</u>. at 865, to the grievance machinery --- a distinctive (and often singular) ability to get things filed. And "by virtue of [their] position[s]," <u>id</u>. (cleaned up), they may also be able to easily call on useful resources. A lawyer to help pull together grievance paperwork, for example. Or someone from the national who can offer advice.

But <u>Javitz</u> teaches that all of this is "secondary." <u>Id</u>. The work the HR director was "paid to perform," <u>Flora</u>, 776 F.3d at 180, was not reporting on improper recordings --- so she was speaking as a citizen when she raised complaints about that.

So too here.

15

There is no suggestion that the Plaintiff-union leaders were paid by the police department to file the grievances at issue in this case.  And the likelihood that they were especially well-positioned to file such grievances --- per Javitz, that alone does not change the equation.

$$* \qquad * \qquad *$$

Together, Flora and Javitz make clear that speech not made pursuant to an employee's "primary job duties," Javitz, 940 F.3d at 865, the speech that someone is not "paid to perform," Flora, 776 F.3d at 180 --- that speech is generally protected.[21]

That strengthens the conclusion that the Plaintiff-union officials' grievance-filing in this case counts as citizen speech.  There are no allegations that filing grievances was part of the work the Plaintiffs were "paid to perform," or fell within the duties the Plaintiffs owed their employer as members of the police force.

### d)    Conclusion

The Court holds that, on the current allegations, the grievances filed by the Plaintiff-union officials do not count as employee speech, but as citizen speech.

---

[21]  Flora and Javits are no outliers.  See, e.g., Bradley v. West Chester Univ. of Pa., 880 F.3d 643, 647-48, 652 (3d Cir. 2018) (holding that a school finance director engaged in unprotected "employee" speech when she presented an "alternate budget," because her job description expressly "indicated that she was expected to review and recommend . . . changes to the University's budget allocation processes") (cleaned up); De Ritis v. McGarrigle, 861 F.3d 444, 449-50, 453-54 (3d Cir. 2017) (holding that an assistant public defender engaged in unprotected "employee" speech when he spread a "rumor while he was representing clients in court, during the usual idle chatter while waiting for court to begin or end;" this was "part and parcel of his ordinary job duties" because those "job duties included in-court obligations to build rapport with the court and other attorneys") (cleaned up); Santiago v. N.Y. & N.J. Port Auth., 687 F. App'x 146, 150 (3d Cir. 2017) (holding that a police officer engaged in unprotected "employee" speech when she sent a "handwritten report" about public safety concerns, because filing this type of safety report "was within the scope of her ordinary duties").

That holding flows from the various court of appeals cases involving organized-labor speech.  See Part II.A.1.a.  From a Supreme Court union case.  See Part II.A.1.b.  And from the Third Circuit's general First Amendment retaliation jurisprudence.  See Part II.A.1.c.

### 2.    Public Concern

Based on the above, the first of the three prongs of the "protected speech" test is satisfied.  See Part II.A.1.

Move now to the second prong --- whether the various grievances the Plaintiffs filed on behalf of their unions involved matters of "public concern."  Connick v. Myers, 461 U.S. 138, 147 (1983).

\*      \*      \*

The "public concern" box is checked when, considering the "content, form, and context of a given statement," id. at 147-48, it can be "fairly considered as relating to any matter of political, social, or other concern to the community."  Id. at 146.

Speech that relates to purely private matters or that "merely [sets out] personal grievances" --- that does not qualify. Feldman v. Phila. Hous. Auth., 43 F.3d 823, 829 (3d Cir. 1994).

The inquiry is statement-by-statement, and requires a "particularized examination of each activity for which the protection of the First Amendment is claimed."  Johnson v. Lincoln Univ., 776 F.2d 443, 451 (3d Cir. 1985).

\*      \*      \*

Here, there are three main sets of grievances.[22]

---

[22]  The Defendants take the Plaintiffs as also focusing on a few other grievances.  See Defendants' Brief at 6.  But this misunderstands the Plaintiffs' core arguments.  See Plaintiffs' Brief at 8-12 (characterizing the grievances discussed in this Part II.A.2 as the speech that was assertedly protected under the First Amendment).  For their part, the Plaintiffs' briefing refers to a "fourth issue involv[ing] the actions of the Plaintiffs . . . in advising the City's personnel office that" the Chief of Police "was no longer in the negotiations unit represented by" the union.  Id. at 12.  But there are no

Tick through them now, and consider whether the Plaintiffs have adequately alleged that each raised a matter "of some public concern." <u>Fenico</u> v. <u>City of Phila.</u>, 70 F.4th 151, 164 (3d Cir. 2023).

### a)    <u>Benefits</u>

The first set of grievances successfully challenged an alleged municipal decision to "unilaterally remove all City personnel . . . from the defendant City's self-insured hospitalization, medical and prescription plans and involuntarily place them in the New Jersey State Health Benefit Plan," in violation of the union's collective negotiation agreements.  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Second Amended Complaint ("Plaintiffs' Brief") (ECF 57) at 8 (citing Complaint ¶¶ 17, 29).

These grievances seem to have been filed on behalf of all of the unions' members.  <u>See</u> Complaint ¶¶ 15-17, 24.

And as described in the complaint, these grievances do not seem to focus on a marginal or small-bore issue.  A forced switch from one healthcare program to another is typically an issue of real importance.  And per the complaint, it was reported in local newspapers that the undoing of the healthcare change by these grievances "could have a major impact on the City's budget," to the tune of "as much as $20 million per year," and could impact "nearly 2000" municipal workers.  Complaint ¶¶ 27, 30 (cleaned up).[23]

\*    \*    \*

Can the Plaintiffs' First Amendment retaliation claim be dismissed to the extent it rests on this set of grievances, on

---

allegations as to this in the operative complaint.  <u>See</u> Defendants' Brief at 25-27.

[23]  A caveat.  The allegations listed out in the text as to the breadth of the impact of the healthcare change --- those allegations account for the changes' impact on the two police unions at issue here, and <u>also</u> for the changes' impact on other municipal employees.  <u>See</u> Complaint ¶ 23.  (And maybe even the changes' impact on <u>all</u> municipal workers.)  The Defendants do not spotlight any of this in their briefs, or press any argument as to why it might make a difference.

the theory that these grievances do not plausibly relate to a matter of public concern?

No, for two reasons.

*    *    *

First, again, is the Supreme Court's Janus decision.[24]

Per the Janus Court, "[i]t is impossible to argue that the level of . . . state spending for employee benefits . . . is not a matter of great public concern."  585 U.S. at 910-11 (cleaned up).  And the filing of union grievances advocating for changes to union members' employee benefits has the potential to affect such spending.  See id. at 912.

Indeed, the Supreme Court in Janus noted that "the Union respondent . . . recently filed a grievance seeking to compel Illinois to appropriate $75 million to fund a 2% wage increase" as an example of a circumstance in which "the handling of grievances may be of substantial public importance."  Id. at 914.

This suggests that the Plaintiffs' employee-benefits grievances here plausibly amounted to a matter of a public concern.

This case, like Janus, concerns a grievance that had an impact on government spending on employee benefits.  And while Janus spotlighted a $75 million impact on a state budget, the relevant grievance in this case is about an alleged impact of around $20 million dollars on the budget of a mid-sized city.[25]

If in Janus it made sense to take the $75 million grievance as a matter "of substantial public importance" id. at 912, then it makes sense to think that the public concern bar is cleared here, too --- and the Defendants, who have the burden, see Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005), have not made any persuasive arguments to the contrary.

To be sure, prior to Janus the Supreme Court had indicated that in the public-employee-speech context the First Amendment does not "'constitutionalize the employee grievance.'"  Borough of

_____

[24]  Recall that Janus arose in a different First Amendment context.  See footnote 19.

[25]  But see footnote 23.

_Duryea_ v. _Guarnieri_, 564 U.S. 379, 392 (2011) (quoting _Garcetti_, 547 U.S. at 420); _see_ _also_ _Connick_, 461 U.S at 154.

So there could be some arguable tension between _Borough of Duryea_ and _Connick_ on the one hand, and _Janus_ on the other.

But _Janus_ suggests a way to reconcile the cases --- by a look to _aggregate_ impact.

Per _Janus_, everyday grievances affecting only a small number of employees seem to be on a different footing than grievances that impact a large number of employees.  A "mundane," _Munroe_, 805 F.3d at 467, employee benefits issue raised for a single employee may raise no issue of public concern.  But things start to shift when that same bread-and-butter issue is pressed on behalf of many employees.  Per the _Janus_ Court:

> Suppose that a single employee complains that he or she should have received a 5% raise. This individual complaint would likely constitute a matter of only private concern and would therefore be unprotected . . . .  But a public-sector union's demand for a 5% raise for the many thousands of employees it represents would be another matter entirely. Granting such a raise could have a serious impact on the budget of the government unit in question, and by the same token, denying a raise might have a significant effect on the performance of government services.

_Janus_, 585 U.S. at 907; _cf._ Transcript, _Janus_ v. _Am. Fed'n of State, Cnty. & Mun. Emps., Council 31_, 585 U.S. 878 (2018) (No. 16-1466) at 31:10-33:25.

Accordingly, per the _Janus_ Court, "[w]hen a large number of employees speak through their union, the category of speech that is of public concern is greatly enlarged, and the category of speech that is of only private concern is substantially shrunk." _Id_. at 907-08.

Look through that lens, and the benefits grievances here are yet more plausibly a matter of public concern.  These grievances were filed on behalf of all of the members of two unions.  And they touched on budget issues that were broader, even, than that.

*    *    *

There is also a <u>second</u> reason to think that the benefits grievances cannot be dismissed at this point for not touching on a "public concern."

Per the complaint, "newspapers in the state of New Jersey reported" on the dispute over the change in benefits that this set of grievances challenged.  Complaint ¶¶ 27, 30.  They published articles stating that "2000 workers, retirees[, and dependents]" could be affected by a change in benefits, <u>id</u>. ¶ 27, and noted that the city could find itself in a "$20 million fiscal hole" if it was precluded from making the change due to union opposition.  <u>Id</u>. ¶ 30.

The Third Circuit has indicated that media coverage is of "some relevance" to the public concern inquiry.  <u>Watters</u> v. <u>City of Philadelphia</u>, 55 F.3d 886, 895 (3d Cir. 1995); <u>see</u> <u>also</u> <u>Monsanto</u> v. <u>Quinn</u>, 674 F.2d 990, 997 (3d Cir. 1982) (holding that speech was a matter of public concern, in part because the issues "were deemed important enough to be subject of at least two radio broadcasts"); <u>Rode</u> v. <u>Dellarciprete</u>, 845 F.2d 1195, 1201-02 (3d Cir. 1988) (indicating that a "news reporter's initiative" in covering the issue was "evidence[]" that it was a matter of public concern); <u>Munroe</u>, 805 F.3d at 470-71 ("[T]he extensive media coverage of her blog and the statements she made to the media generally indicated that Munroe met the 'public concern' element.").

Under these cases, media coverage of a given matter can be something of a proxy, though an imperfect one, for what the public is concerned with.

And so the Plaintiffs' media-attention allegations in this case provide an added, modest reason to think the benefits grievances they helped to file meet the public concern test.

### b)    <u>Transfers</u>

The second set of grievances allegedly challenged a reassignment and change in work hours for 68 members of the police force. <u>See</u> Complaint ¶¶ 32-33.[26]

---

[26]  At one point, the complaint also suggests that a grievance was filed challenging the removal and reassignment of one specific "extra duty officer who was historically and consistently appointed by the PBA president."  Complaint ¶ 33. But that is the only information in the complaint that seems to

Per the Plaintiffs' allegations, these police officials were transferred on account of their "connection" to the Police Chief's predecessor.  See id. ¶¶ 31-32, 34.  Citing newspaper articles, the Plaintiffs allege that the Police Chief focused on certain members of the force he deemed "loyal" to his predecessor, id. ¶¶ 32, 34, and that the "68 officers" who were transferred were on a "hit list."  Id. at ¶ 32.

Construing all this in the Plaintiffs' favor, as the Court must at this stage, this set of grievances can be taken as having been premised on allegations of some potentially improper behavior on the part of the Police Chief.

And when speech attempts "to bring to light actual or potential wrongdoing or breach of public trust" on the part of government officials, it will generally clear the "public concern" bar. Connick, 461 U.S. at 148; see also Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993) (stating that speech is on a matter of public concern where "the speaker seeks to 'bring to light actual or potential wrongdoing or breach of public trust' on the part of government officials"); Baldassare v. New Jersey, 250 F.3d 188, 195-96 (3d Cir. 2001) (similar); Brennan v. Norton, 350 F.3d 399, 412 (3d Cir. 2003), abrogated in part on other grounds by, Borough of Duryea v. Guarnieri, 564 U.S. 379 (2011).

Accordingly, the Plaintiffs have, for now, adequately alleged that the employee-transfer grievances were "of some public concern."  Fenico, 70 F.4th at 164.[27]

---

pertain to this particular grievance.  This is too little to go on, and nothing else in the complaint suggests that the Plaintiffs are alleging retaliation based on this grievance.  So the Court declines to consider it here.

[27]  Given this conclusion, there is no need to consider whether a "mundane employment grievance[]," Munroe, 805 F.3d at 467, about an internal transfer from one job to another, can become "a matter of public concern," id., when it allegedly (i) concerns 68 people in the aggregate and (ii) is covered in a newspaper. See generally Part II.A.2.a.

### c)    Personnel Records

The third and final set of alleged grievances aimed to undo a then-new police department policy on the release of information about members of the force.

In particular, the Mayor allegedly announced that "the City's police department [planned to] publicly publish the names of rank and file and superior police officers who have been fired, demoted or suspended for more than five days over the last 20 years, together with a statement of the violations for which they were disciplined."  Complaint ¶ 38.

This plan was purportedly part of a broader "effort [toward] law enforcement accountability," and was announced via a "press release [that] was broadcast on TV news outlets, online news publications[,] and print newspapers."  Id.

A grievance on this subject plainly meets the public concern test.  See Burne v. Siderowicz, 445 F. App'x 529, 532 (3d Cir. 2011) (noting that "transparency in government affairs" is "normally characteristic of an issue of public concern"); see also Fenico, 70 F.4th at 164-66.[28]

### 3.    Balancing

Because the Court has concluded that each of the three sets of grievances allegedly filed by the Plaintiffs were of "some public concern," Fenico, 70 F.4th at 164, the Court moves now to the third and final step of the "protected speech" analysis: the balancing test announced in Pickering v. Board of Education, 391 U.S. 563 (1968).

"To be protected by the First Amendment, [the] Pickering [balancing test] requires that the employee's interest in speaking outweigh the government's interest in promoting workplace efficiency and avoiding disruption."  Fenico, 70 F.4th at 166.

The burden of demonstrating such disruption is on the government employer.  See id. at 162 (citing Connick, 461 U.S. at 149-52).

But for now, the Defendants here have made no real effort to carry that burden, and nothing in the allegations suggests that

---

[28]  And recall that media coverage tilts the scale to an extent in favor a "public concern" conclusion.  See Part II.A.2.a.

23

the filing of the relevant grievances "impeded" anyone's "ability to perform [their workplace] responsibilities." Connick, 461 U.S. at 151.[29]

*    *    *

The Plaintiff-union officials, as set out above, have adequately alleged that various grievances they helped to file count as protected speech under the First Amendment.

The grievances were plausibly "citizen" speech. See Part II.A.1. They were on matters of "public concern." See Part II.A.2. And the Defendants have opted not to press a balancing argument. See Part II.A.3.

## B.    **Motivating Factor**

In light of the just-stated conclusion, the question becomes whether the Plaintiffs have plausibly alleged that the referenced "speech was a substantial or motivating factor in the [Defendants'] alleged retaliatory action [against them]." Munroe, 805 F.3d at 466.

This inquiry can be broken down into two questions.

First, causation. Was the Plaintiffs' protected activity "a substantial or motivating factor," id., in bringing about the alleged retaliation?

And second, was the alleged action taken by the Defendnats sufficiently serious, such that it counts as "retaliatory?" Id.[30]

---

[29] See generally Fenico, 70 F.4th at 163, 166-68 (noting that in many cases courts may be unable to engage in meaningful Pickering balancing until there are "concrete" facts and evidence speaking to the "likelihood of disruption" posed by the speech at issue).

[30] To establish a First Amendment retaliation claim, public employees "must sufficiently allege two elements: that (1) the activity in question is protected by the First Amendment," (covered in Part II.A), "and (2) the protected activity was a substantial factor in the alleged retaliatory action." Falco, 767 F. App'x at 298. Private citizens, "on the other hand, . . . must allege three elements." Id. A private employee must show "that (1) he engaged in a protected activity, (2) [that the defendant's] retaliatory action was sufficient to deter a person of ordinary firmness from exercising his rights, and (3) there

24

### 1.    Causation

A plaintiff can "establish the requisite causal connection" in a number of ways, including by proving "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action."  Lauren W. ex rel Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

But causation does not need to be worked through here because the Defendants have not raised any causation-related arguments.  See United State v. Sineneng-Smith, 590 U.S. 371, 374-75 (2020).

### 2.    Retaliation

Was the Defendants' alleged conduct sufficiently serious such that it can be considered "retaliatory"?  Munroe, 805 F.3d at 466.

Here, the Plaintiffs argue that the Defendants engaged in a number of alleged acts of retaliation.

The Plaintiffs allege, for example, that they had been entitled to flexible schedules (like "non-duty status" and "irregular hours") to accommodate work for their respective unions.  See Complaint ¶¶ 45-49 (cleaned up).

---

exists a causal connection between the protected activity and the retaliatory action."  Id.  But "in their application, both iterations of the elements boil down to similar core considerations."  Id. at 299.  This is because Step 2 of the public-employee test encompasses Steps 2 and 3 of the private-citizen test.  See id. at 310-11; Suppan v. Dadonna, 203 F.3d 228, 234-35 (3d Cir. 2000); see also Javitz, 940 F.3d at 863 (applying the ordinary firmness and causal link tests in a public employee case); Josephson v. Ganzel, 115 F.4th 771, 787-88 (6th Cir. 2024) (same); Heim v. Daniel, 81 F.4th 212, 221 & n.9 (2d Cir. 2023) (same); Pieczynski v. Duffy, 875 F.2d 1331, 1333 (7th Cir. 1989) (similar).  To ensure that the second factor of the public-employee test ("the protected activity was a substantial factor in the alleged retaliatory action") does not lose sight of the "ordinary firmness" aspect of things, it is helpful to break apart the second factor when applying it.  Into its causation component ("substantial factor").  And into the component that is related to the ordinary firmness issue (action that is substantial enough to count as "retaliatory").  That is how the analysis proceeds in this Part II.B.

But after they filed the relevant grievances, these benefits were allegedly taken away. <u>See</u> <u>id</u>. ¶ 58.  The Defendant-Police Chief allegedly announced that the Plaintiffs would not be allowed to "deviate" from their departments' ordinary scheduled hours to conduct union business, and that "they were to report to and stay in their respective assigned division work spaces . . . rather than in the union offices," <u>id</u>. --- all allegedly contrary to longstanding tradition and their entitlements under the union's collective bargaining agreement.[31]  <u>Id</u>. ¶¶ 45-48, 58-59.

In a similar vein, the Plaintiffs allege that after they pressed the grievances, the Defendant-Police Chief "rescinded an overtime assignment," <u>id</u>. ¶ 96, altered some of the Plaintiffs' car privileges, <u>see</u> <u>id</u>. ¶¶ 79-81, and excluded the Plaintiffs from preforming important ceremonial functions at an annual 9/11 memorial ceremony.  <u>See</u> <u>id</u>. ¶¶ 86-87.

There is more,[32] but put it aside for now.

Focusing just on what is laid out above --- does that plausibly count as "retaliatory"?

---

[31]  The Complaint states that about a month after the Police Chief engaged in certain alleged acts of retaliation, the Plaintiffs were granted interim relief.  <u>See</u>, <u>e.g.</u>, Complaint ¶ 65.  But the Plaintiffs allege that they were nevertheless adversely affected because, before the interim relief, the Plaintiffs "used their accumulated contractual leave time rather than adjust their hours to perform off-duty employment . . . and they have not had that leave time reinstated to them."  <u>Id</u>. ¶ 66.  All of this might have an impact on the possible damages available here.  But it does not undo the allegation of a retaliatory act.

[32]  Some additional alleged instances of retaliation include: (i) initiating frivolous internal affairs investigations, <u>see</u> Complaint ¶¶ 55-57, 85, (ii) attempting to reassign one of the Plaintiffs to different police divisions, <u>see</u> <u>id</u>. ¶¶ 61-62 (iii) accusing them of criminal conduct, <u>see</u> <u>id</u>. ¶ 82, and (iv) spreading false or misleading information about them to their union membership.  <u>See</u> <u>id</u>. ¶¶ 83, 88-93.  But there is no need to take these on here.  At this stage, it is enough for there to be one sufficient alleged act of retaliation.  <u>See</u> <u>Falco</u>, 767 F. App'x at 315.

The conduct alleged to be retaliatory must have been sufficiently serious that it would "deter a person of ordinary firmness from exercising his First Amendment rights." Falco v. Zimmer, 767 F. App'x 288, 310 (2019) (internal quotation mark omitted); Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000) (cleaned up); see also footnote 30.

But this "deterrence threshold . . . is very low." O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006) (cleaned up). Indeed, "a cause of action [for First Amendment retaliation] is supplied by all but truly de minimis violations." Id. This standard is met even by "a campaign of petty harassments," Suppan, 203 F.3d at 235 (cleaned up), and "act[s] of retaliation as trivial as failing to hold a birthday party for a public employee." Rutan v. Republican Party of Ill., 497 U.S. 62, 75 n.8 (1990) (cleaned up).

Consistent with this, courts of appeals around the country have held that even not-very-large tweaks to an employee's working conditions count as "retaliatory" for First Amendment purposes. See, e.g., Dye v. Off. of the Racing Comm'n, 702 F.3d 286, 303-04 (6th Cir. 2012) (holding that a "decrease in work days," and "discontinued . . . use of [a] bank-timed system" could "chill or silence a person of ordinary firmness"); Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 225-26 (2d Cir. 2006) (noting that "reduction[s] in pay, and reprimand[s]" can be adverse actions, along with "lesser actions" like "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process . . . forms, and assignment to [a work space that] aggravated [one's] physical disabilities") (cleaned up); Hoyt v. Andreucci, 433 F.3d 320, 329 (2d Cir. 2006) (holding similarly for the reassignment of job responsibilities and a change to the "physical location of his job"); see also, e.g., Manhattan Beach Police v. City of Manhattan, 881 F.2d 816, 818-19 (9th Cir. 1989) ("A public official cannot withhold a substantial benefit from an employee because of activities protected by the [F]irst [A]mendment . . . This is true whether that benefit is economic . . . or some other condition of employment, such as location or job assignment.").[33]

---

[33] See also, e.g., Marrero v. Camden Cnty. Bd. of Soc. Servs., 164 F. Supp. 2d 455, 467 (D.N.J. 2001) (clarifying that "the scope of adverse action, for the purpose of a First Amendment

And the Third Circuit has taken the same tack.

In Baloga v. Pittson Area School District, 927 F.3d 742 (3d Cir. 2019), for example, the court of appeals reiterated that while "the nature of the retaliatory acts committed by the public employer must 'be more than de minimis,' . . . the threshold is 'very low.'" Id. at 758 (quoting O'Connor, 440 F.3d at 128). In support of this, the court noted the Supreme Court's observation that "'an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her' First Amendment right[s]" meets this standard. Id. (quoting Suppan, 203 F.3d at 234; quoting Rutan, 497 U.S. at 76 n.8) (ellipses in original).

Applying this guidance, the Baloga court rejected the argument that the plaintiff lacked a cognizable First Amendment claim because the alleged retaliatory actions were too slight to count.  Per the Third Circuit:

> Although the [plaintiff's] transfer did
> not change his pay or benefits, Baloga testified
> that it negatively affected him in other ways. For
> example, he could no longer go home during lunchtime
> to help his wife, who homeschools their eight
> children, because the primary center is twice as far
> as the high school from his home. He also could no

_____

retaliation claim, is not limited to drastic retaliation," and concluding that sending an individual "home (without pay) for violating the dress code" and "castigat[ing] her in front of her co-workers" may contribute to a finding of retaliation "if taken with the intent to retaliate for protected speech"); Fredericks v. Township of Weehawken, 2012 WL 5628196, at *1, *7 (D.N.J. 2012) (denying a motion to dismiss where the alleged retaliation included stopping the plaintiff from attending educational seminars he had attended for more than 15 years, denying "promised back-pay" for certain work, passing the plaintiff over for a raise, and telling the plaintiff to "route all of his communications through the Township's CFO"); cf. Ivan v. County of Middlesex, 595 F. Supp. 2d 425, 472 (D.N.J. 2009) (contrasting the standard for retaliatory conduct under Title VII and the New Jersey Law Against Discrimination with the "liberal standard" of the First Amendment, and concluding that instances "discriminatory application of sick leave and shift change policies" could "deter a person of ordinary firmness from making complaints").

28

> longer work the 6:00 a.m. to 2:00 p.m. shift --- a
> benefit only available to workers at the high school
> --- which had allowed him to go home early at least
> once a month. [The plaintiff also] described the
> transfer as effectively a demotion in job
> responsibilities, with attendant reputational and
> emotional costs, as his tasks at the primary center
> during the winter months were menial relative to
> those at the high school, reducing him to "a mop and
> a broom."

Id. at 750-51.

Based on this testimony, the court of appeals held that it could not conclude, "as a matter of law . . . that the alleged retaliation had no 'adverse effect,'" because "viewed in the light most favorable to [the plaintiff], the record support[ed] the opposite inference." Id. at 759; see also Suppan, 203 F.3d at 231-32, 234–35 (holding that evidence of "stress" and "loss of reputation" from an unsatisfactory employment rating was sufficient to raise triable issue on adverse action) (cleaned up).

The Plaintiffs' allegations of retaliatory conduct in this case are of similar-enough severity. Here, the Plaintiffs have alleged, among other things, that the Defendants revoked their "non-duty status," see Complaint ¶¶ 45-46, and flexible hours, see id. ¶¶ 47-49, which prevented the Plaintiffs from working a 10:00am to 6:00pm shift instead of the typical 8:00am to 4:00pm shift and made it difficult for the Plaintiffs to perform their duties as union officers. See id. ¶¶ 49, 58.

The Plaintiffs also allege that several other "rights, privileges and benefits," id. ¶ 51, were revoked. Changes were made to their ability to attend an annual union conference "without loss of pay or benefits." Id. To the way in which they were allowed to use municipal vehicles. See id. ¶ 79-81. And to their ability to take a lead role in helping to honor first responders killed on 9/11 at an annual ceremony. See id. ¶¶ 86-87.

The shift in schedule and attendant lack of flexibility roughly mirrors the alleged retaliation in Baloga. And the revocation of other privileges --- as to, for example, the 9/11 memorial --- could plausibly carry something akin to the "reputational and emotional costs" discussed in Baloga. 927 F.3d at 751.

Accordingly, the Court cannot now conclude "that the alleged retaliation had no 'adverse effect.'"  Id. at 759.

### C.    Conclusion

Drawing all inferences in their favor, as the Court must at this stage, the Plaintiffs' complaint plausibly alleges that they engaged in speech that was protected under the First Amendment, see Part II.A, and that such protected activity was a substantial or motivating factor, see Part II.B.1, in bringing about retaliatory acts.  See Part II.B.2.

Therefore, the Defendants have not carried their burden of showing that the Plaintiffs' First Amendment free-speech retaliation claims must be dismissed.

## III. Other Claims

Part II addressed the Plaintiffs' First Amendment free speech claims.

Invoking the same underlying allegations, the Plaintiffs have also pressed retaliation claims under other bodies of law: (i) the freedom of petition and association guarantees of the federal First Amendment, see Complaint ¶¶ 112-19, plus (ii) New Jersey's First Amendment-equivalent.  See id. ¶¶ 120-25; see also Part I.A.

The Defendants have moved to dismiss these retaliation claims, too.  Assess, now, this aspect of their motion.

*    *    *

Federal claims first.

As to the Plaintiffs' claim that they were retaliated against for exercising their First Amendment right to petition, this is analyzed under the same standard as their claim that they were retaliated against for exercising their First Amendment right to free speech.  See Borough of Duryea, 564 U.S. at 382-83.

So because the Plaintiffs' free speech claim can go forward, see Part II, their petition claim can, too.

As for the Plaintiffs' claim of retaliation based on the exercise of their First Amendment free association rights --- the standards for that are less rigorous than the standards for

30

stating a First Amendment claim for retaliation based on speech. See Baloga, 927 F.3d at 752, 755.

So same point: because the Plaintiffs' free speech claim can go forward, see Part II, their free association claim can, too.

*    *    *

Now take the New Jersey Constitution claims.

The New Jersey free speech claim also rises and falls with the federal claims here, because "[t]he Free Speech Clause contained within the New Jersey Constitution is generally interpreted as co-extensive with the First Amendment." Palardy, 906 F.3d at 80 (cleaned up).[34]

And so too as to the freedom of petition and association claims under the New Jersey Constitution. See, e.g., Farneski v. County of Hunterdon, 916 F. Supp. 2d 573, 582 n.10 (D.N.J. 2013) (stating that "freedom of petition" rights "under the New Jersey Constitution . . . are generally interpreted to be co-extensive with the First Amendment") (cleaned up); see also Turner v. N.J. State Police, 2017 WL 1190917, at *21 (D.N.J. Mar. 29, 2017); Newton v. Greenwich Township, 2012 WL 3715947, at *2-3 (D.N.J. Aug. 27, 2012); Wiley Mission v. New Jersey, 2011 WL 3841437, at *18 (D.N.J. Aug. 25, 2011); State v. Schmid, 84 N.J. 535, 560 (1980).

In sum: the Plaintiffs' federal constitutional claims can go forward, see Part II, so their New Jersey constitutional law claims can also go forward.

## IV.    Qualified Immunity

A final note here.

"An official sued under § 1983 for an alleged constitutional violation is entitled to qualified immunity unless he (1) violated a constitutional right that (2) was clearly established when he acted." Stringer v. County of Bucks, 141 F.4th 76, 85 (3d Cir. 2025).

---

[34] "Generally" because there are some differences. See, e.g., Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 264-65 (1998). But no party suggests they matter here.

31

The Defendants argue that they are entitled to qualified immunity here.  <u>See</u> Defendants' Brief at 36-40.

But the qualified-immunity burden is theirs, <u>see</u> <u>Stringer</u>, 141 F.4th at 86, and they have not carried it.

This is for two reasons.

*    *    *

<u>First</u>, there is a mismatch between the Defendants' qualified immunity argument and the allegations here.

For example, the Defendants argue that "Plaintiffs do not, and cannot, allege that the decision to switch health plans violated any clearly established right," nor can they establish that the Defendants' decisions "to alter the work hours of officers throughout the City" or "plan to release records of police misconduct" violated any of their rights.  Defendants' Brief at 38-39.

But this aims at the wrong target.

The Plaintiffs' argument is not that it was unconstitutional to, say, swap out one healthcare plan for another.  Rather, the Plaintiffs' argument is that it was unconstitutional for the Defendants to allegedly retaliate when they (the Plaintiffs) filed union grievances against the healthcare change.

*    *    *

<u>Second</u>, the Defendants do not make any argument as to the "clearly-established" prong of the qualified immunity test.

They argue only that they are entitled to qualified immunity under the other prong of the analysis --- the prong looking to whether the Defendants "violated a constitutional right." <u>Stringer</u>, 141 F.4th at 86; <u>see</u> Defendants' Brief at 38-39.

But on this approach, there is no meaningful difference between the Defendants' qualified immunity argument and the argument (already rejected, in Part II and Part III above) that the Plaintiffs' claims cannot go forward for now.

## V.    <u>Conclusion</u>

The individual Defendants' Motions to Dismiss at ECF 56 is denied.

IT IS on this 27th day of March, 2026, **SO ORDERED.**

32

_____

Michael E. Farbiarz, U.S.D.J.